UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

JOHN BRYANT,

           Plaintiff,

   v.

SHAW INDUSTRIES, INC.,

           Defendant.
_____/

NO. CIV. S-04-685 LKK/DAD

O R D E R

On January 22, 2004, plaintiff, John Bryant ("Bryant") brought suit under the California Fair Employment and Housing Act ("FEHA"), alleging that he was harassed and discriminated against on the basis of race by defendant, Shaw Industries ("Shaw"). On April 6, 2004, defendant answered and asserted thirty-six affirmative defenses.[1] On the same day, defendant removed the case

---

[1] While the court recognizes that the answer was filed in state court, it clearly was filed in contemplation of removal to this court. An answer raising 36 affirmative defenses is obviously a violation of Rule 11. Because the conduct has caused no greater inconvenience than the drafting of this footnote, the court will take no further action. This staying of the court's hand should

1

to this court based on diversity jurisdiction.  Pending before the court is defendant's motion for summary judgment.

## I.

## FACTS[2]

Plaintiff is African-American. Pl.'s Depo. at 11:9-10.  On September 17, 2001, he was employed by defendant as a truck driver based at its distribution center in Sacramento.  Pl.'s Depo. at 10:16-24.  Plaintiff was responsible for driving a tractor trailer to various locations to pick up and deliver rolls of carpet and pallets of hard surface flooring such as tile.  Pl.'s Depo. at 48:23-49:18.  Upon his hire, plaintiff received copies of various Shaw policies and rules.  These included rules on warehouse dock safety and rules for securing his truck and its contents.  Pl.'s Depo. at 78:1-80:14; Exhs. 3-5.

Plaintiff's manager throughout his employment at Shaw was Mike Williams.  Pl.'s Depo. at 19:17-18; 41:2-4; Pelicas Decl., ¶ 2; Williams Decl., ¶ 2.  Plaintiff's supervisor throughout his employment at Shaw was Troy Pelicas.

One of the regular routes at the Sacramento Shaw facility is a round trip route between Sacramento and Reno.  During most of plaintiff's employment with Shaw, his supervisor assigned drivers Roger Erwin and Jim Harding to the Reno route.  Pelicas Decl., ¶ 4.  Roger Erwin was hired by Shaw prior to plaintiff.  Jim

---

not be interpreted as condoning such conduct, nor should counsel expect such a sanguine response to such conduct in the future.

[2]   All facts are undisputed unless otherwise noted.

2

Harding was hired the day after plaintiff was hired. Both Roger Erwin and Jim Harding are Caucasian. Pelicas Decl. ¶ 4; Pl.'s Depo. at 85:18-20.

When Jim Harding became injured, Pelicas filled the Reno route Harding covered by having the three least senior drivers at Shaw's Sacramento facility drive the Reno route "once every three weeks," with Roger Erwin driving the Reno route on the remaining days. The three least senior drivers at that time were Bob Hale, Mike Erwin, and John Bryant. Pelicas Decl., ¶ 4. Plaintiff avers that he drove the route more frequently than Mike Erwin or Bob Hale. Bryant Decl., ¶ 6. Hale and Erwin were hired by Shaw before Plaintiff and had more seniority than plaintiff. Pelicas Decl., ¶ 4. Pelicas avers that in his opinion allocating Harding's Reno route assignment in this manner would be the fairest way to accomplish the task. He claims that he did not consider race in staffing the Reno route that had previously been covered by Jim Harding. Pelicas Decl., ¶ 4. It is undisputed that plaintiff was not asked to drive to Reno until after Jim Harding became injured. Pl.'s Depo. at 85:7-86:15.

Plaintiff asserts that although he was comfortable driving to Reno when the roads were clear, he did not want to drive to Reno because he felt he lacked experience driving in snow and ice and was not comfortable putting chains on his tires. Pl.'s Depo. at 42:10-16; 99:25-100:2. Plaintiff received training from Shaw on how to chain his tires and on snow and ice conditions, which he claims was inadequate. Pl.'s Depo. at 93:20-25; 95:13-96:22;

3

Bryant Decl., ¶ 5.  Plaintiff drove the Reno route a total of four to five times in snow and ice conditions.  Pl.'s Depo. at 97:22-98:24.  He claims that on one trip he needed assistance from Caltrans.  Bryant Decl., ¶ 7.  When asked why he believed he was assigned to the Reno route because of his race, plaintiff's only response was "because I was the only black guy and they said make him do it."  Pl.'s Depo. at 98:25-99:9.

In July 2002, before his trailer was finished being loaded by a forklift driver, plaintiff backed up his rig, hooked it up to the parked trailer, and stepped on the accelerator to "tug" and secure the coupling.  In doing so, plaintiff pulled the tractor a few inches away from the loading dock.  Pl.'s Depo. at 138:11-22; 139:10-15; 141:1-142:23: 181:7-13, Exh. 2.  Plaintiff claims that the forklift operator called him a "stupid asshole." Bryant Decl., ¶ 9.  Shaw's Dock Safety Procedures provide that when a trailer is finished being loaded, a fluorescent red cone is to be placed on the dock, signifying that the trailer is ready to be moved.  In September 2001, plaintiff signed off that he had read and understood this "red cone policy."  Pl.'s Depo. at 78:1-10; 79:18-24; Exh. 3.  There was no red cone on the loading dock when plaintiff pulled the trailer away in July 2002.  Pl.'s Depo. at 177:6-16.  Plaintiff was given a written warning and was told that any further violations in the next three months would result in his termination.  Pl.'s Depo. at 159:1-13.  Plaintiff believes other drivers also pulled their trucks away from the loading dock when no red cone was in place.  Indeed, Pelicas, has disciplined another

4

employee in addition to plaintiff for violating Shaw's Red Cone policy.  In late 2001, Pelicas issued a final warning to a Caucasian driver for pulling a tractor trailer away from the loading dock while it was still being loaded.  Pelicas Decl., ¶ 5. Aside from plaintiff and the Caucasian driver, Pelicas is not aware of any other Shaw driver who pulled his tractor trailer away from the loading dock while it was still being loaded.  Pelicas Decl., ¶ 5.  When asked why plaintiff believed he received a warning for the red cone violation because of his race, plaintiff responded that "they" (clarifying that this refers to "the white guys") perceive a "black guy's ways" to be "mean, aggressive [and] common" and that "[a] black guy don't get a chance like a white guy."  Pl.'s Depo. at 161:3-163:5.

Drivers at Shaw turn in a log of their whereabouts each day. Part of Pelicas' job is to review the drivers' logs regularly.  He noticed in reviewing the drivers' logs in November 2002 that plaintiff appeared to take longer to complete his route than Pelicas expected to see.  Pelicas brought this to the attention of manager Mike Williams.  Pelicas Decl., ¶ 6; Williams Decl., ¶ 5. Williams followed plaintiff as he drove his route on November 14, 2002.[3]  Williams observed plaintiff make several local stops in the Sacramento area.  When plaintiff stopped for lunch, plaintiff did not lock up his tractor and trailer, but instead left the rig

---

[3] Prior to November 2002, Pelicas pointed out to Williams that a Caucasian Shaw driver appeared to be taking longer on his route than necessary.  Pelicas followed that driver but did not observe him do anything inappropriate.  Pelicas Decl. ¶ 6.

5

unlocked and left the keys in the ignition. Plaintiff then got in a vehicle, left the area to get lunch, and was away from his truck for an hour. After plaintiff left, Williams approached the plaintiff's truck and was able to open the cab door. Inside, Williams saw the keys to the truck still in the ignition. Pl.'s Depo. at 223:8-224:17; 232:9-233:18; Williams Decl., ¶ 5. Upon his hire, plaintiff received a copy of Shaw's Driver Lunch/Break Schedules & Driver Responsibility policy and a copy of Shaw's Regional Operations - Driver Guidelines. These policies stated that drivers were required to secure and lock their tractor trailers during lunch periods. Plaintiff signed off that he had received and understood these policies. He is unaware of any Shaw policy to the contrary. Pl.'s Depo. at 78:1-10; 79:8-12; 80:2-8; 231:22-24, Exhs. 4-5. Williams and Pelicas discussed the situation. Defendant claims that during this discussion, neither Pelicas nor Williams mentioned plaintiff's race in any way.

Plaintiff was subsequently called in by Williams to discuss the incident. Plaintiff admitted that he had, in fact, left his rig unlocked, with the keys in it, while he left and took lunch. Williams terminated plaintiff's employment and told him that the reason for the discharge was his conduct. Pl.'s Depo. at 223:1-13; 239:7-23; Williams Decl., ¶ 6. Plaintiff believes drivers Bob Meacham, Bob Hale, Mike Erwin, Roger Erwin, Victor Flores, Chris and Jerry (last names unknown) all left their trucks unlocked with the keys in them while taking lunch but were not fired. Pl.'s Depo. at 233:23-234:24. Plaintiff only actually saw one driver,

1  Roger Erwin, leave his truck unlocked with the keys in it while on
2  lunch break.  As for drivers Meacham, Hale, Mike Erwin, Victor
3  Flores, Chris and Terry, plaintiff does not know that they actually
4  left their trucks this way, but claims that he heard that they had.
5  Pl.'s Depo. at 235:8-238:15.  It is disputed whether Pelicas or
6  Williams knew anything about Erwin leaving his truck unlocked with
7  the keys in it while on lunch break.  Pl.'s Depo. at 237:10-22;
8  Bryant Decl., ¶ 13.
9       When asked why he believed his termination was racially
10 motivated, plaintiff responded that if white employees did what he
11 did, they would not have been fired, and that black people "have
12 very small limitations of things that we can do and get away with."
13 Pl.'s Depo. at 241:3-23.
14      Plaintiff claims that in roughly November 2001, while
15 plaintiff and other drivers were in the break room watching news
16 coverage on 9/11, one of the drivers, Mike Erwin, remarked, "Oh
17 those damn sand niggers."  Pl.'s Depo. at 29:16-30:25; 31:24-25.
18 Plaintiff was a little offended by the remark but did not construe
19 it to be a slur about African-Americans.  He never complained about
20 it or mentioned it to anyone.  Pl.'s Depo. at 28:3-12; 32:1-5.
21      In March or April 2002, during the NBA playoffs between the
22 Sacramento Kings and the Los Angeles Lakers, plaintiff (a Lakers
23 fan) remarked "How 'bout those Kings?" to a fellow driver (and
24 Kings fan) Mike Erwin.  He made this comment just after the Lakers
25 had beaten the Kings.  Plaintiff claims that Mike Erwin responded,
26 "Oh, here comes that nigger with that stuff again."  Pl.'s Depo.

7

at 11:24-12:5; 14:12-22; 14:23-25;16:5-6.  Plaintiff claims he was offended by the March/April 2002 remark at the time it occurred. Pl.'s Depo. at 21:3-13.  Mike Erwin had no supervisory authority over plaintiff.  Nothing further was said between plaintiff and Erwin.  Plaintiff never heard any other slurs about his race from anyone at Shaw, including Pelicas and Williams, either directly or indirectly.  He never told Pelicas or Williams that he believed either had made a racial slur or remark.  Plaintiff did not file a DFEH complaint until November 12, 2003.  Pl.'s Depo. at 266:1-9; Exh. 6.

## II.

### STANDARDS

Summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); See also Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970); Secor Limited v. Cetus Corp., 51 F.3d 848, 853 (9th Cir. 1995).

Under summary judgment practice, the moving party "[a]lways bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). "[W]here the nonmoving party will bear the burden of proof at trial on a

dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" Id.  Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. See id. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id.  In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." Id. at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); See also First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 288-89 (1968); Secor Limited, 51 F.3d at 853.

In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11; See also First Nat'l

1  Bank, 391 U.S. at 289; Rand v. Rowland, 154 F.3d 952, 954 (9th Cir.
2  1998).  The opposing party must demonstrate that the fact in
3  contention is material, i.e., a fact that might affect the outcome
4  of the suit under the governing law, Anderson v. Liberty Lobby,
5  Inc., 477 U.S. 242, 248 (1986); Owens v. Local No. 169, Assoc. of
6  Western Pulp and Paper Workers, 971 F.2d 347, 355 (9th Cir. 1992)
7  (quoting T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n,
8  809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine,
9  i.e., the evidence is such that a reasonable jury could return a
10 verdict for the nonmoving party, Anderson, 477 U.S. 248-49; see
11 also Cline v. Industrial Maintenance Engineering & Contracting Co.,
12 200 F.3d 1223, 1228 (9th Cir. 1999).
13     In the endeavor to establish the existence of a factual
14 dispute, the opposing party need not establish a material issue of
15 fact conclusively in its favor.  It is sufficient that "the claimed
16 factual dispute be shown to require a jury or judge to resolve the
17 parties' differing versions of the truth at trial."  First Nat'l
18 Bank, 391 U.S. at 290; See also T.W. Elec. Serv., 809 F.2d at 631.
19 Thus, the "purpose of summary judgment is to 'pierce the pleadings
20 and to assess the proof in order to see whether there is a genuine
21 need for trial.'"  Matsushita, 475 U.S. at 587 (quoting Fed. R.
22 Civ. P. 56(e) advisory committee's note on 1963 amendments); see
23 also International Union of Bricklayers & Allied Craftsman Local
24 Union No. 20 v. Martin Jaska, Inc., 752 F.2d 1401, 1405 (9th Cir.
25 1985).
26 ////

1    In resolving the summary judgment motion, the court examines
2 the pleadings, depositions, answers to interrogatories, and
3 admissions on file, together with the affidavits, if any. Rule
4 56(c); See also <u>In re Citric Acid Litigation</u>, 191 F.3d 1090, 1093
5 (9th Cir. 1999). The evidence of the opposing party is to be
6 believed, see <u>Anderson,</u> 477 U.S. at 255, and all reasonable
7 inferences that may be drawn from the facts placed before the court
8 must be drawn in favor of the opposing party, see Matsushita, 475
9 U.S. at 587 <u>(citing United States v. Diebold, Inc.</u>, 369 U.S. 654,
10 655 (1962) (per curiam)); <u>See also Headwaters Forest Defense v.</u>
11 <u>County of Humboldt</u>, 211 F.3d 1121, 1132 (9th Cir. 2000).
12 Nevertheless, inferences are not drawn out of the air, and it is
13 the opposing party's obligation to produce a factual predicate from
14 which the inference may be drawn. <u>See Richards v. Nielsen Freight</u>
15 <u>Lines</u>, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d
16 898, 902 (9th Cir. 1987).

17    Finally, to demonstrate a genuine issue, the opposing party
18 "must do more than simply show that there is some metaphysical
19 doubt as to the material facts. . . . Where the record taken as a
20 whole could not lead a rational trier of fact to find for the
21 nonmoving party, there is no 'genuine issue for trial.'"
22 <u>Matsushita</u>, 475 U.S. at 587 (citation omitted).
23 ////
24 ////
25 ////
26 ////

1 **III.**

2 **ANALYSIS**

3  Plaintiff maintains that he was harassed and discriminated
4 against while employed with defendant, all of which culminated in
5 his termination on November 19, 2002.  Defendant moves for summary
6 judgment on plaintiff's two claims which are brought pursuant to
7 California's Fair Employment and Housing Act ("FEHA").  As I
8 explain below, defendant's motion must be GRANTED.

9 **A.   RACIAL HARASSMENT CLAIM**

10  California courts look to federal court decisions interpreting
11 Title VII in their resolving of FEHA racial harassment claims.
12 See, e.g., Etter v. Veriflo, 67 Cal.App.4th 457, 464 (1999).  A
13 plaintiff may prove racial harassment by demonstrating that an
14 employer has created a hostile or abusive work environment.
15 Meritor Savings Bank v. Vinson, 477 U.S. 57, 65-67 (1986).  To
16 prevail on a hostile workplace claim premised on race, plaintiff
17 must show: (1) that he was subjected to verbal or physical conduct
18 of a racial nature; (2) that the conduct was unwelcome; and (3)
19 that the conduct was sufficiently severe or pervasive to alter the
20 conditions of the plaintiff's employment.  Vasquez v. County of
21 L.A., 349 F.3d 634, 642 (9th Cir. 2003)(citing Gregory v. Windnall,
22 153 F.3d 1071, 1074 (9th Cir. 1998)).  To demonstrate a hostile
23 work environment, a plaintiff must show that the environment is
24 abusive from both a subjective and an objective viewpoint.  See
25 Harris v. Forklift Systems, Inc., 510 U.S. 17, 21-22 (1993).
26 ////

In assessing the objective hostility of the a work environment, the court considers a variety of factors, including "the frequency of discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance." Nichols v. Azteca Rest. Enters., 256 F.3d 864, 872 (9th Cir. 2001); See also Vasquez, 349 F.3d at 643. Although the complaint alleges that "[d]efendant has taken demeaning actions toward Plaintiff, including . . . harassing Plaintiff because of his race/national origin," Compl. at 2, neither the complaint nor plaintiff's opposition brief discuss incidents which might potentially constitute actionable racial harassment. Indeed, plaintiff's opposition is completely silent as to racial harassment as an independent claim. Thus, it appears that plaintiff has abandoned the claim.[4]

**B.    RACE DISCRIMINATION CLAIM**

Plaintiff also asserts that Shaw discriminated against him based on his race. To establish a prima facie case of

---

[4] Two incidents pertaining to the use of the word "nigger" by a fellow employee has been noted. The one relating to the 9/11 incident and the other the Kings game. Neither suffices to hold defendant for trial on a harassment claim. "[S]imple teasing, offhand comments, and isolated incidences . . . will not amount to discriminatory changes in the terms and conditions of employment." Faragher v. City of Boca Raton, 524 U.S. 775, 787 (1998). While the extremely offensive nature of these remarks is clear, no reasonable jury could find that plaintiff's allegations constitute conduct so extreme or pervasive so as to alter the conditions of employment. See, e.g., Vasquez v. County of Los Angeles, 349 F.3d 634, 643 (9th Cir. 2003); Sanchez v. City of Santa ana, 936 F.2d 1027, 1031 (9th Cir. 1990).

13

discrimination, plaintiff must provide evidence that (1) he belongs to a protected class; (2) he was performing competently in the position he held; (3) he was terminated despite his qualifications or experienced some adverse employment action; and (4) some other circumstance suggests discriminatory motive. <u>Guz v. Bechtol Nat'l, Inc.</u>, 24 Cal.4th 317, 355 (2000)(citing <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802 (1973)). Because of the similarity between state and federal employment discrimination laws, California courts follow federal precedent in applying FEHA to discrimination claims. <u>Guz</u>, <u>id.</u> at 354. The <u>prima facie</u> burden is not an onerous one, but plaintiff must show, at the very least, "actions taken by the employer from which one can infer, if such actions remain unexplained, that it is more likely than not that such actions were "based on a [prohibited] discriminatory criterion[.]" <u>Id</u>. (quotation omitted).

Establishment of a <u>prima facie</u> case creates a presumption that the employer unlawfully discriminated against the employee. <u>Texas Dep't of Comty. Affairs v. Burdine</u>, 450 U.S. 248, 254 (1981). Once the plaintiff has established a <u>prima facie</u> case of discrimination, the burden shifts to the defendant to articulate a legitimate nondiscriminatory reason for its actions. <u>McDonnell Douglas</u>, 411 U.S. at 802. The defendant must produce admissible evidence of the reasons for plaintiff's rejection sufficient to create a genuine issue of fact as to whether it discriminated against plaintiff. <u>Burdine</u>, 450 U.S. at 254-255. The defendant must submit evidence that, taken as true, would permit the conclusion that there was a

14

nondiscriminatory reason for its actions.  St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 509 (1993).  If the defendant does so, the presumption raised by the prima facie case is rebutted and disappears.

Finally, if the defendant articulates a legitimate, nondiscriminatory reason for the employee's rejection, plaintiff must tender evidence that the defendant's proffered reason was a pretext for discrimination.  McDonnell Douglas, 411 U.S. at 804.[5]

Plaintiff is African-American, and thus is a member of a protected class, satisfying the first requirement of the prima facie case.  Pl.'s Depo. at 11:9-10.  Defendant claims that plaintiff cannot make out a prima facie case of discrimination because his job performance was unsatisfactory.  They cite to his two violations of Shaw's written policy, which led to his termination.  Plaintiff contends that he was performing his job satisfactorily as he was no longer on probation at the time he was terminated.  Opp'n at 4.  He was also employed with Shaw for over a year, and the record indicates that only two disciplinary actions were taken against him during this time.  Viewing the evidence in the light most favorable to plaintiff, as this court must do in deciding a motion for summary judgment, the court will assume, arguendo, that plaintiff has raised a triable issue as to whether he was qualified for the position from which he was terminated.

---

[5] The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.  Burdine, 450 U.S. at 253.

15

It is undisputed that plaintiff was fired from his position as a truck driver from Shaw, thus, the third element of the prima facie case is satisfied.  Finally, plaintiff alleges that he was treated differently than his white counterparts, in that he was disciplined for conduct that white employees would not have been fired for, and that he drove the Reno route more than the other two white individuals assigned to the route.  Pl.'s Decl., ¶¶ 4, 6, 8, 9, 15. Although there is contrary evidence in the record, and the matter is very close, viewing the record in its totality and drawing all inferences in plaintiff's favor, I conclude he has met his burden of establishing the existence of a prima facie case of race discrimination.

    The burden now shifts to Shaw to advance a legitimate, non discriminatory reason for plaintiff's termination and adverse actions taken against plaintiff. Defendant contends that plaintiff was discharged because he violated two Shaw policies - for failing to secure his truck while it was unattended, and for failing to follow the red cone policy when his truck was being loaded. It notes that a Caucasian driver was disciplined for violating the red cone policy that plaintiff's supervisor has monitored the whereabouts of a Caucasian driver to make sure they do not leave their trucks unattended and that plaintiff was assigned to drive the Reno route because one of the regular drivers was injured; and that plaintiff was assigned to the route with two other Caucasian drivers who had the least seniority out of all the employees.  This evidence more than meets defendant's burden of providing

16

legitimate, non-discriminatory reasons for the disciplinary actions and his ultimate termination.

Because defendant has provided a legitimate non-discriminatory reason for plaintiff's termination, plaintiff must provide sufficient evidence to rebut Shaw's showing. Plaintiff's attempts to do so are unavailing. Plaintiff responds to defendant's proffered justifications by questioning them as "suspect at best" because "other employees engaged in same/similar conduct as Plaintiff did but were not disciplined for it." Plaintiff also maintains that the court should consider the racial comments which were made in his presence as part of the cumulative evidence of pretext. Compl. at 4.

A plaintiff may establish pretext "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." Burdine, 450 U.S. at 256.

When a plaintiff produces direct evidence of discrimination, "a triable issue as to the actual motivation of the employer is created even if the evidence is not substantial." Id. In contrast, where, as here, plaintiff attempts to show through circumstantial evidence that the employer's proffered explanation is not credible, the plaintiff must produce "specific, substantial evidence of pretext." Godwin, 150 F.3d at 1221 (quotations omitted).

////

1    Plaintiff admits that he never heard any of his superiors make
2 any statements about his race, and the fellow worker who made
3 disparaging remarks to him about his race, had no authority to
4 discipline him.  Pl.'s Depo. at 19:3-19.  Indeed, it appears that
5 plaintiff did not bring the incident to management's attention.
6    Plaintiff insists that he may raise a triable issue as to
7 discrimination because defendant did not treat him similarly to
8 other truck drivers, and that he was punished for conduct that
9 others did not get punished for.  Put directly, there is no
10 evidence in the record to support plaintiff's claim.  The evidence
11 reveals that plaintiff was given a final warning for violating the
12 red cone policy, but his supervisor gave a Caucasian driver a final
13 warning for violating the same conduct.  Pelicas Decl., ¶ 5.
14 Plaintiff also argues that he was unfairly singled out for
15 termination because other drivers left their trucks unlocked.
16 Other than plaintiff's hearsay-based belief, however, there is not
17 evidence to support the claim.
18    Plaintiff's claim that he was specifically picked to drive to
19 Reno because of his race also finds no support in the record.  It
20 is undisputed that plaintiff was not picked to drive to Reno until
21 a Caucasian driver who regularly drove the route was injured, and
22 the substitute drivers were those with the least seniority and
23 included two Caucasians.  In sum, there is no triable issue with
24 regard to plaintiff's claims of race discrimination.
25    There is no question that the federal and state anti-
26 discrimination statutes are important tools in this society's

18

effort to eradicate the scourge of racism.  Suits claiming discrimination which are without substance, however, undercut that important tool, and indeed bring the effort into disrepute.

Defendant's motion for summary judgment is GRANTED and the Clerk is directed to CLOSE the case.

IT IS SO ORDERED.

DATED:  April 29, 2005.

/s/Lawrence K. Karlton
LAWRENCE K. KARLTON
SENIOR JUDGE
UNITED STATES DISTRICT COURT